at all, case number 18-10642. Mr. Wilkinson, whenever you're ready, take your time. Good morning. May it please the Court? The Supreme Court has long held that the Constitution does not stop at the walls of a prison, and when this case was previously appealed and extended that maxim to the walls of a civil commitment facility like the one that Mr. Pesci resided in. This appeal involves challenges to two policies brought forth by the Florida Civil Commitment Center, the first of which being in November of 2010, the facility administrator Timothy Budz enacted a policy that outright banned one of Mr. Pesci's publications called Duck Soup. Let me ask you a procedural question before you dive into the merits, please. Did Mr. Pesci seek damages or just declaratory and injunctive relief in the complaint that counsel filed? Were you the lawyer who was appointed by the district court? No, that was a different attorney. We took the case after it came back down from the Eleventh Circuit. Okay. Well, thank you for your assistance. But in that complaint, was there only declaratory and injunctive relief sought, or was there also a claim for damages of one kind or another? There were claims for damages against several of the individual defendants. And related to which policies, if you remember? I believe he claimed on all of the counts that there was a claim for damages. But the primary relief sought in the lawsuit is the injunctive relief to continue to publish this newsletter. Right. And so this leads to my second procedural question, then I'll let you get on with the argument. To the extent that only declaratory and injunctive relief were sought as to the 2006 policy, which limited the type of paper that was used and the number of times you could go in and print the publication, are any of those challenges moot? Because of the 2010 policy, which was more restrictive and outright banned? So there is one policy that is moot, and that's the 2009 policy that related to duck soup. So initially in 2009, they enacted a policy that said that Mr. Pesci could still publish duck soup, but he could not print it out. So in other words, residents either had to go online, which they could do at the time to access that publication, or he could save it on the shared computers and residents could use their own means to access it during that time when they were at the computer. Subsequent to that policy in 2010, November 2010, Mr. Budds changed the policy again and said no, no duck soup at all. That was the outright ban. Right. And so that policy mooted the 2009 policy which imposed printing restrictions on duck soup. So as far as you're concerned, there's nothing on the 2009 policy for us to review in this appeal? Correct. And when this court initially sent the case back down, they said it would basically be an advisory opinion because it's no longer in effect because of the 2010 policy. I wanted to make sure nothing had happened in the interim to make that policy kick back in, but you're saying no. No. But there has been a policy since 2006, which is still in effect, that says that he can only print 20 pages of any newsletter, and the only individuals that are not subject to that requirement are the pro-social clubs that have unlimited printing within the facility. And that's the subject of the second policy we're challenging. So the 2006 and 2010 policies are the ones at issue? Correct. Also, you said in your opening remark that Mr. Pesce resided in one of these facilities. Is he no longer? He still is. Okay. And many people do not leave those facilities, and Dr. Kropp's testimony, our expert, he said in the 300 or so that he has evaluated, very few ever actually make it to the point of program and leave and go back into society. And Mr. Pesce is not one of them. Can you give him a couple of more minutes back on his time, please? Thank you. Okay. Go ahead. And so as an initial procedural matter before I get into the Turner standard, this case is being brought before the court on an order granting summary judgment. Many cases that we've looked at and that the jury cite in their briefs are following a bench trial or some other proceeding where there has been a fact finder who's made a determination as the genuineness of the justifications asserted by the facility administrators. This is not one of those cases. This is a case where the parties have submitted evidence on summary judgment and no trial, whether a bench trial or jury trial, has been held. So the record evidence in this case paints two very different pictures of how this newsletter affected the facility. The facility administrators and their affidavits painted as being very inflammatory, causing, quote, rising tensions within the facility and otherwise causing a lot of problems and they saw the need to correct it. On the other hand, the evidence introduced by Mr. Pesce is that this caused no disruption and that's laid out by both the affidavits that he produced of the residents of the facility and also through the testimony of Dr. Kropp, who says that he has been evaluating people in this facility since before it opened, really, and he has seen no change and had in fact never even heard of Duck Soup before this litigation started. And he said that the complaints and the things that Mr. Buds and the other administrators pointed out as being problems caused by Duck Soup were in fact have been problems that have been complaints that have been voiced throughout this facility's entire run. It's complaints about staff turnover. It's complaints against kind of authoritarian treatment that they're subjected to and complaints against the inability to get out and the inability to graduate from these programs. I think that's your strongest argument, personally, with regards to the 2010 ban. But weren't there affidavits from some of the staff at the center that were uncontroverted? For example, the testimony, I think, of one of the nurses about one of the disturbances that occurred when there was an allegation that she was not doing the right thing with regards to a resident's mail? Correct. And that is the one factual incident that they pointed to where they can show that there was any kind of bad conduct as a result of Duck Soup. And that affidavit, while it is troubling, she never said that the residents behaved violently toward her. She never said that even that the complaints that the residents were bringing were prompted by Duck Soup and not the original gentleman who had the complaint that his mail had been tampered with that Duck Soup had reported on. Furthermore, there are cases that say an isolated security incident, such as the example of a facility opening everyone's mail because of an anthrax scare that happened three years ago, is not necessarily enough to bridge a logical connection between a legitimate interest in security and the facility and the restriction on speech itself. Moreover, what's telling in this case is that incident occurred in June of 2010. The ban on Duck Soup did not occur until four months later in November of 2010. What's more telling is that the date that Mr. Buds got served the lawsuit for Mr. Pesci's original challenge to the Duck Soup printing restrictions was in September of 2010, less than six weeks before the Duck Soup publication was banned. So the record is replete with evidence that this whole justification that he's asserting is not really motivated by the security concerns or treatment concerns, but is really trying to get back at Pesci or punish him for his critical views of the facility staff and administration. Don't those issues, to use a phrase from the last case, don't those issues sort of combine at some point, right? Because his ability to speak and be critical of what's going inside can, to a degree, disrupt the legitimate functioning of the institution. For example, let me give you an example that's not this case, okay? I'm not suggesting that Mr. Pesci did this, but if you had a newsletter which was making unsubstantiated and really, really bad allegations about the staff inside, that could seriously cause a problem, right? Like an inmate passes away, and the allegation is that the inmate was euthanized. Or somebody is injured, and the allegation is that one of the staff members used excessive force as opposed to trying to calm the inmate down and get him or her to go back to his room, those sorts of things can certainly lead to a problem, can they not? If they're false. Right, and how are you supposed to figure that out ex ante? Well, and the facility has different ways of dealing with false allegations outside of banning a newsletter. If this were a case where Mr. Pesci had a ream of disciplinary reports that said that he was printing false stories and they had been proven false, this would be a different case. Even though the administrators make a lot of claims that he portrayed the staff in false light, there's no specific allegations of stories that Pesci has printed that they say are untrue when they point out these excerpts where Mr. Pesci is writing in kind of an inflammatory way. There's an even trickier hypothetical, I think. Let's say that a newsletter is publishing actually stories that are true. But those stories and the way they're presented are causing the inmates to riot and attack staff members. Doesn't, I think that's a little bit of an even trickier situation. How do you respond to that? And it depends, and every case is going to be case specific, and that's the necessity of a trial in these situations. Is you can't just use a formalistic, logical thing that says, well, this story seems really inflammatory, so the prisoners may riot. As the Seventh Circuit said when they applied the Pesci standard, there has to be some evidence connecting the stories themselves to the behavior that they're afraid that the people will engage in. So there would have to be some kind of evidence that would bridge the story itself to a real threat of there being a riot. Now the case law is very clear, an actual riot doesn't have to take place, but it's not enough for the facility administrator to on their own say, in my professional opinion, this is going to cause a riot. You can't just use a formalistic, logical conclusion like that. And that's the same type of logic that says, we can't allow these residents to view R-rated films or pornography because that's going to cause them to regress. It may make a certain amount of logical sense, but if it's not backed up by data, or any other kind of evidence, then that's not enough to bridge the first prong of the Turner test. It's interesting because even in the Turner test, I think there's a, the case law is clear that we offer additional discretion to prison officials that we wouldn't offer in other contexts. How do you balance the discretion that we're told we need to give prison officials against what I think we would see as the normal summary judgment standard? Well, in our view that the discretion that's owed to them is based on their professional judgment. It's not based on what they believe the facts of the case are. Deference is not equal being able to rely on their version of the facts versus our version of the facts. That has to be determined by a fact finder. And then based on the facts that the fact finder determines, then you look at what the justifications are. And that's when deference is applied in determining whether there is a rational connection between the regulation and the undesired outcome, and I see that I'm out of time, so I'm going to- You don't deny that deference has to be given. Your point, I think, is, at least with regard to the 2010 policy, that you can't apply that deference until you figure out the facts on the ground. And that's where you use the traditional summary judgment standard. If the facts are disputed, then you need a trial at least on some factual issues. Once you figure out what the facts are, then you give deference to the facility administrators in terms of their policies. Correct, and it's kind of like employment law. We give deference to business owners. We don't like courts telling people how to run their business. But if there is evidence of a justification being pretext for unlawful conduct, then that deference isn't given until the jury can make a determination. So that's what we'd argue the same standard. And, in fact, when this court remanded the case, it said that concerns about facility security and treatment cannot be used as a pretext to silence undesirable speech. So that's our position, and it was too premature to dismiss the case at this stage. All right, thank you very much. Thank you. Thank you, Your Honors, and may it please the Court, Brett Warnicke. How do you pronounce your last name? It's a difficult one. It took me a while to, it's Warnicke.  Yeah, as if the O's not there. Good morning. Judge, I think what we were focusing on in your question towards Mr. Wilkinson is the deference. And what we've learned from Turner is that in the absence of substantial evidence for Mr. Pesci to overcome the policy decisions that Mr. Budds made in this case, the expert, that we ordinarily should defer to Mr. Budds. I agree with that deference point, but let me tell you at least where my concern is about the 2010 policy. Okay. Page 12 of the District Court's order. The District Court says this, and I'm going to quote, other evidence establishes that these adverse impacts were widespread and serious. That is certainly some of the evidence presented by the defendants in this case. But viewed in the light most favorable to Mr. Pesci, there's other evidence in the case suggesting otherwise. How do you, same sort of question that Judge Grant asked Mr. Wilkinson, how do you square the Rule 56 summary judgment standard with the deference? Don't you have to do facts first and deference second? Well, first of all, Mr. Pesci has never disputed, he never filed an affidavit in this case, he never did anything. No, but he submitted an expert report and they were the testimony of some of the other residents. And well, and every other resident that did submit an affidavit all stated that the staffs were upset about this, what was going on in Duck Soup. In fact, Mr. Pesci himself wrote an article in Duck Soup saying how all the staff feels slandered about what's going on in there. Certainly creating a household work environment, and what we're forgetting here is that in January 2010, Mr. Pesci himself said that he was threatened by two officers at the Civil Commitment Center based on what he wrote. And that was also established by the witness affidavits who said that Mr. Pesci's articles, while the residents enjoyed reading them, the staff certainly did not. And in fact- You have, that may all be true at the end of the day, but you've got affidavits like the one from Mr. Hayes, who is a resident, who says, and I quote, while it may be true that the resident population is in a state of agitation, it has nothing to do with Duck Soup. Rather, it is the prison-like conditions of confinement that the GEO group is imposing on its mental health patients. What do you do with that testimony at summary judgment? Well, I don't think the testimony, because the testimony is that we have to look at the deference of the experts. I mean, if that's not what the residents agree, if that's what they think that is, that's fine. But what we're talking about here is the specific examples that he's putting in this newsletter. As an example, he published to a compound of 660 sexually violent predators. That a specifically named lieutenant liked to watch them shower, that this specifically named lieutenant was racist. He puts in September 2009, that his previous edition of Duck Soup really upset a lot of people on the compound. November 2009, he tells the compound, again, full of 660 people who are considered to be sexually violent predators. Who Mr. Pesci's own expert said have psychopaths, violent psychopaths inside this facility. Says that the administrators will overlook crimes that are committed in the facility. He published in December 2009, a specifically named employee urinated all over herself at work. Published that name all over the compound. I know, but here, again, it's going to the same point about how you try to square the Rule 56 standard with the deference mandated by the modified Turner standard. Here's what Mr. Pesci's expert said. I have seen no evidence to indicate that Pesci's newsletters undermine the authority of the treatment staff or cause the residents to lose confidence in the treatment program. I have seen no changes in the rate or pace of progress by residents other than what I noted regarding staff turnover. And I have not seen any changes in residents' attitudes toward treatment. And I have not seen any evidence regarding concerns related to confidentiality. At summary judgment, what do you do with that expert report on the side of Mr. Pesci? Well, first of all, I mean, I know I'm still harking back to the deference standard, but he is not the one that's on the ground that's in there. We have people that are in there every single day. And even Dr. Kropp stated that he had no reason to disagree with Dr. Wilson's personal observations at the time. But even in a prison setting, right, where Turner clearly applies uninhibited, don't you figure out the facts on the ground before you figure out what the deference, how you give deference, and when you give deference? In other words, if a prison official says I have this policy because of X reason, and X reason turns out to be false, you don't give deference at the front end. You give deference only if there's some evidence to support that there is X reason. Is that not accurate? Well, I think we did, though, in this case, Your Honor. And in fact, if we look at Lawson versus Singletary, and which was echoed last year by the prison legal news case versus Secretary. This court doesn't sit as the super warden, so to speak. The second guests are getting into the day-to-day operations of the real people on the ground. Nobody doubts that, but what do you do? Okay, so let me try to change facts, and maybe drive the point home a little bit more. Mr. Budge, or whoever the director was at the time, says as a result of Mr. Pesci's newsletter, Duck Soup, the following seven incidents of disruption and threats and everything else have occurred. And he lists all seven of them. Summary judgment, he provides an affidavit, and so does another staff member saying, yep, these seven things occurred. You have testimony, affidavit testimony, deposition testimony from inmates, and maybe even other staff members that say, these seven incidents did not occur. What happens at summary judgment with regard to deference? Well, nothing in those affidavits ever contradicted Ms. Farrell. You're dealing with a hypothetical first, and then you can switch back to this case. In my hypothetical, what happens at summary judgment with regard to the director's policy? Well, I still think you can look at the facts. I mean, yeah, we have the facts here where we have residents who are saying, I didn't see anything that would affect it, but- No, I'm going to make it even harder for you then, because you're not going to be able to squeeze out of this hypothetical. I'm not trying to squeeze out of the hypothetical. In this hypothetical, you've got affidavits from staff and from other residents, which directly contradict based on personal knowledge and perception that these seven alleged incidents asserted by the director did not occur. At summary judgment, what do you do? What does a district judge do, grant or deny summary judgment? I think you can grant it depending on what the residents are actually saying and what they're testifying to. Okay, then again, let me go fix the hypothetical. Dr. Butt says, on date X, staff member X was subjected to this sort of threat by this resident. On the other side of the case, the staff member says, I was never threatened by that resident. The resident says, I never threatened a staff member. What happens at summary judgment? There will be an issue of material fact as to those staff members who Mr. Butts claimed, or at least as to those residents who claim they accosted a staff member. If the staff member says that that happened and the residents say it did occur, we have an issue of material fact. Before you get to deference. Well, yes, of course. That should be what happened here. And maybe you're right. It didn't happen here. Okay. And maybe you're right. That there isn't a conflict in testimony as stark as the one that I just painted. But, isn't it true that you, well, I shouldn't suppose anything. Isn't it appropriate to look at whether or not there are material issues of fact and dispute before applying the deference standard mandated by the modified Turner standard? If there were issues of material fact, I agree with you, Your Honor. What if, to adjust Judge Jordan's hypothetical, what if the director and the staff member say this attack occurred on the staff member by this inmate? And the inmate said in a separate affidavit, no it didn't, that's not what happened. Still an issue of material fact in your opinion? Absolutely, if that occurred, which didn't happen here. Sure. But if that occurred, absolutely that's an issue of material fact, but that never occurred here. Before you look at deference. Sure.  And that was undisputed, that's what happened in this case. What about the expert report? The expert report, he never, he couldn't dispute that. He didn't know anything about it. All, all the expert report, and that's what- He says he's seen no evidence of any of the problems that Mr. Budds alluded to. Well, he said, actually, if you read through Dr. Kropp, he said that he agrees that some of the things that were put in Mr. Pesci's newsletter would create a security concern. Could, could create. And that's when we go back now to the Lawson case out of this court in the late 90s, if we go back, even go back to Thornburg in the late 80s from the US Supreme Court. We don't have to show with absolute certainty a particular consequence would occur if we failed to do something. All we have to do is anticipate that there could be a consequence. That's what Lawson said in 1998. That's what this court said last year in prison legal news. You're absolutely getting rid of the misconception that we have to show with absolute certainty a consequence will happen if we fail to do something. All we have to do, according to Thornburg versus Abbott, the 1989 case out of the US Supreme Court, 88 or 89, that says all we have to do is anticipate that something could happen, and I think Mr. Budds, when he's getting reading that Mr. Pesci himself is getting threat, threatened by three separate staff members of his own, that we have a nurse who's undisputed, was accosted on a couple occasions by various sexually violent predators due to what Mr. Pesci wrote in his articles, I mean, he has an absolute duty to try and shut this down. He let the- That's one dispute that counsel has raised. It seems that everyone agrees that she was attacked, but there's a dispute over whether the newsletter was the reason or the source of that attack. Is that something where we would grant deference, or what's your response to that? Well, I think you absolutely grant deference with the fact that she's getting accosted, this is the story, she's getting accosted, she didn't know why. She goes into the lounge, she's freaked out, she's asking everybody else what's going on. Here you go, here's the latest duck soup, and it plasters her name all over duck soup as stealing resident's mail, and that's what she was just getting yelled at about by all the residents about accusing them of stealing the resident's mail. She goes to Mr. Bud, says she's absolutely afraid of this publication, she's fear for herself on the compound. At this point, what is this administrator supposed to do? I mean, does he allow this to keep going? I mean, I realize here that shutting down a First Amendment right is a tough thing to do, and they let this thing go on for a long time before now finally we have a nurse that's being accosted. We have Mr. Pesci writing that he's being threatened by several different staff members, employed staff members from our company, are threatening this man now. At some point here, there are no material facts regarding those. There are absolutely no issues of material facts regarding those incidents at all. And Mr. Pesci certainly doesn't dispute that, none of his witness affidavits dispute that that all happened. And I think Mr. Bud's, it's his responsibility for the safety and the security of this facility, which Dr. Kropp testified houses violent psychopaths, psychopaths with impulse and personality disorders, agreed with Mr. Pesci. And Mr. Pesci wrote in an article at Duck Soup that there are violent and impulsive people on this compound. Is there a total ban in effect right now on the instigator in Duck Soup? Not on the instigator, just on Duck Soup. Just on Duck Soup. Yes. And the instigator, he can do 20 pages. Yes, just like any other- Every other day. That's correct, and that's a uniform policy that's applied since 2000. He's challenging the instigator issue too. Well, the instigator issue, I think would be- That's on appeal as well.  Well, there's not a total ban on the instigator. No, absolutely not. And I think Mr- We'll give him a couple of more minutes too. And then let me address the instigator. Thank you. The issue, and I think Mr. Pesci probably- Let me just tell you my observation. That it's been toned down in the instigator. It's toned down, sure. I went through them all and listed all the comments. They were very inflammatory when you start at 2009, 2008. But when you get more to 13, 14, either because counsel's advising him or somebody's helping him, he's toned it down some. Although he- We recognize that. He loses it sometimes. Well, yes. He'll have one sentence in there. Well, yes. I mean, some of these things- But it is toned down. So, you are letting him do the instigator. It's just the restriction of the- Well, it's a restriction.  It's what Beard v. Banks says is a legitimate government purpose. He could use his own paper and do as much as he wants. Well, he can do up to 40 pages. 40 pages on his own paper. Okay, I got it. But not on Duck Soup, because that's banned. That's correct. He can do his instigator, and that's the thing. I think Mr. Pesci has a better argument. If he was comparing, say, for instance, we only allowed him to print 10 pages while every other individual resident can print 20 pages, then I think we have something we really need to have a discussion about. But what we're doing is comparing an individual newsletter to a social club therapeutic newsletter where the general community can participate in. You're going to have more authors. You would necessarily have more articles in the paper, whereas every single resident in the facility is subjected to a 20-page print limitation policy. And that's why I really don't get- Except the social clubs. Well, except for the social clubs. But the reason for the exception of the social clubs is not because of content. It is because more residents can actually contribute to articles in the paper who are residents of these social clubs. And these are social clubs that are- Do you agree we should look at Duck Soup by itself and then look at the instigator and these restrictions by itself? You have no problem with this? Well, I have no problem with that. Separate them and not take all the history of Duck Soup and import it on top of the instigator. I agree that's correct. This has always been presented as two issues. Okay, I'm just making sure you agree with that. The instigator seems to be a lot less inflammatory. A lot less inflammatory, although- Are you trying to support your limitations on the circulation of the instigator based on disruption and chaos in the facility or just on a economic resource? Well, it's the economic resources. Okay, so you're not claiming on the instigator safety, circulation. I'm just trying to see where we are here and how we can- I know, and Mr. Pesci has come over the edge a couple of times. I know we had to warn him. But he's gotten better and then- He's gotten better. The meat is going to change tomorrow. It's better than Duck Soup. It's way better than Duck Soup, but that's why we're allowing him. Okay, so he can still do that. You just claim this restriction only. You're just claiming you should have that restriction based on resources, every- It's undisputed. It applies to all- I don't know why he doesn't write a one-page instigator and circulate when he copies. But he writes 50 pages in the instigator, so then he's got a problem with three pages. What do you make of the suggestion that the center should allow him to pay for extra ink or use his own paper if it's really a resource question? All right, I know I'm running out of time. The Turner says that we don't have to- I appreciate. Turner doesn't say we have to consider and debunk every single potential scenario that they could come up with. So if they want to come up and purchase their own ink, okay? So now we're going to have to take- I'm just thinking here. We're going to have to take the ink out of the shared printer, and then allow this man to go ahead and print this stuff. This is a computer lab with multiple computers, and there's a printer that's being used by 660 residents. And he still doesn't account for the wear and tear on the printers. And all this stuff is coming from the Resident Welfare Trust Fund. So that's why we say, you know, you can bring 40 pages of your own paper, which would allow you to have a 40-page limitation, but this is why we're still keeping you out of limitation, because you still have the wear and tear on the printers and the ink. So if they want to go ahead and print their own ink, we're still not accounting for the printers and then the rigmarole, but we're going to have to take out one ink out of one printer, put in the resident's ink there, then everybody else is going to be held up. I mean, I think we need to start deferring to, you know, what's the policy and what's the best practice here. I mean, we're giving them the opportunity on our printer ink and paper to print and to do things like that. But when we go with Mr. Pesci's route, where he wants to go ahead and try to declare himself a social club, which, again, I don't want to say how you can do that. He's the resident patient and we're the experts, and there's no doubt that even Mr. Pesci's own expert, Dr. Kropp, says, yeah, these serve a therapeutic purpose, which is one of our missions under the statute. We have to treat these people. But think of the slippery slope. Any resident wants to get past this print limitation policy says, I'm a social club. And these social clubs, again, they're open to everybody in the community. They have a staff sponsor. But Mr. Pesci's instigator social club would not be open to everybody in the community. It's on dispute of Mr. Pesci controls who gets to ride in it. You'd say that's an area where we would defer. Is that what you're suggesting? I think you absolutely have to defer. And it's not content-based. I think we would have an absolutely content-based argument if we're comparing Pesci on the individual page limitation requirement. If we're giving him only 10, why everybody else individually has 20? We're going to be in for a long discussion. But that's not what's going on here. And so I know I've run over time. I wish there was a lot more I can say. But I rely on the brief, Your Honor. And I appreciate your time. And I ask that you affirm as the duck soup. I know this is the second time we've been up here on that. Two separate district court judges have rolled in our favor. I ask at this time, we have an affirmance on this. And we also ask for your affirmance on the instigator. Appreciate it. Thank you. Mr. Wilkins. Let me play devil's advocate against myself. So it seems to me that the defense's best argument with regard to the 2020 ban is this. There may have been some issues of material fact based upon the evidence you presented at summary judgment. But there is enough undisputed evidence with regards to other matters to allow the district court to give deference to the administration. Why is that not correct? So the two instances that he identified as being undisputed areas of material fact were first the Margaret Farrell affidavit. And I've identified at least two disputes that would need to be resolved before deference could be given. First and foremost was what Judge Grant brought up is that there is a dispute as to whether duck soup in fact caused the incident that Ms. Farrell described. In her own words, anything can set them off. This was a complaint that pre-dated Mr. Pesci's publication. It was raised by another resident. And it had already been discussed. If you go through and read that June, July 2010 issue, there were already residents talking about it that Mr. Pesci was reporting on. So there's no- Was anyone attacking her ever at that point? Well, the timing on it is not clear as to when the complaint arose versus when the publication was sent out. And the publication never called for anyone to, you know, never singled her out in terms of saying, you know, go get her or anything like that. It was just relaying the complaints that he had heard from the other residents about his situation with his mail being opened. The second disputed material fact, I think the one that is more probative, is did Mr. Buds legitimately rely on this incident to determine in his own professional judgment that there was a security concern? And there are several facts in the record already that would seem to contradict this. First and foremost, you know, Mr. Warnicke even said, you know, how is he going to let this go on? Well, he did let it go on. He let it go on for four months after this happened without taking any action. It was only once Mr. Pesci filed his first complaint that any action against Duck Soup was taken. Basically, the next Duck Soup issue was the last one after that complaint got filed. So a fact finder would have to first determine when looking at that Margaret Farrell incident, is this actually the reason he's relying on to enact this ban? The second purportedly undisputed fact that Mr. Warnicke mentioned was Mr. Pesci's own admission that several staff members confronted him about stories in Duck Soup and that they were harassing him or talking to him about it. That is not a legitimate basis to ban a publication. That is essentially describing, assuming that this court finds that Duck Soup was protected First Amendment conduct, that they were retaliating against him for engaging in First Amendment conduct. And that's a circular argument. You can't suppress speech because of the government's adverse reaction to speech. That's, it's getting it backwards. So neither of those are such undisputed to the point where we would have to take them as true and could move on to apply that deference standard. There are still multiple issues of disputed material fact. Even if we agree that the court has used the word attack, I would not use that word. I would use it to say it's a confrontation because there's no indication that she was ever physically harmed. She said she was threatened, but she didn't elaborate on what those threats were. The district court also said in its order, again on page 12, although I think the district court exaggerated a bit the way the expert phrased it, but I think what your expert conceded was that there was a potential adverse effect to the security of the institution and to treatment at the institution because of Duck Soup. Why isn't that enough? Well, what he conceded were quotes from Duck Soup taken out of context and ask, would that possibly be an adverse effect on treatment or on security? And at the end of the day, you have to look at in context, which he was never shown, and B, you have to look at overall, has this had or is it threatened to have any other impact? And what Dr. Kropp said is that he's been there since 1999 and he hasn't seen any noticeable effect overall on this publication that was been running for a long time. Furthermore, the facility keeps statistics. They cite a statistic of 89% participation rate after Duck Soup, which they said was very good. Yet we don't have any of the other prior years that would show that, hey, there really was a difference during this time. So neither of those are enough to overcome the summary judgment standard, which requires us to look at all facts in the light most favorable to Mr. Pesci on this record, where there really are two different competing views of what possible effect or what effect this publication had. Are you trying to get a bench trial or a jury trial? I believe there's a demand for the jury trial in the complaint. Obviously, the bench would play a large role because of the request for injunctive relief. So even if there was a jury trial, the bench would have a lot of decision making to do and exactly what the remedy looks like. Yes, but you're asking for a jury trial. Correct. On whether or not there was adverse impact on security and treatment. Or if there was a pretext for the security and treatment concerns were a pretext for an unlawful motive. The jury would only determine issues of historical fact in your scenario. And then based on those findings, the court would apply the overlying legal standard, including the Turner modified definition. Correct. All right. Thank you very much. Thank you both. Thank you. We are in recess for this week.